_____

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

IN RE: NASHWAN AL-TAMIR, PETITIONER

_____

ON PETITION FOR WRIT OF MANDAMUS TO
THE UNITED STATES COURT OF MILITARY COMMISSION REVIEW
AND THE DEPARTMENT OF DEFENSE

_____

RESPONDENT UNITED STATES' MOTION
TO MODIFY THE STAY OF THE PROCEEDINGS

_____

MARK S. MARTINS
Brigadier General, U.S. Army
Chief Prosecutor of Military Commissions

HARIDIMOS V. THRAVALOS
Appellate Counsel
Office of the Chief Prosecutor
of Military Commissions

JOHN C. DEMERS
Assistant Attorney General
for National Security

JOSEPH F. PALMER
DANIELLE S. TARIN
Attorneys
National Security Division
U.S. Department of Justice
Washington, DC 20530

<u>CERTIFICATE AS TO PARTIES</u>

Abd al Hadi al-Iraqi (also known as Nashwan al-Tamir) is the petitioner in this case.  The United States is the respondent.

<u>INTRODUCTION AND ARGUMENT SUMMARY</u>

Petitioner Nashwan al-Tamir is an alien detained by the Department of Defense at Guantánamo Bay, Cuba, who has been charged with offenses under the Military Commissions Act of 2009 (10 U.S.C. §§ 948a <u>et seq.</u>) (MCA). In this case, petitioner seeks a writ of mandamus dismissing those charges on the ground that the three military judges who have presided over pre-trial proceedings in the military commission should have been disqualified. On November 6, 2019, this Court granted petitioner's motion for a stay of further proceedings in the military commission pending this Court's resolution of the mandamus petition.

The government respectfully requests a limited, temporary modification of this Court's stay order. The requested modification is necessary to permit the government to preserve, through a deposition, the testimony of Mohammed Junaid Babar, an important government witness who will likely become unavailable to testify at trial. Babar pleaded guilty to terrorism offenses in the Southern District of New York and is required to cooperate with the government in the investigation and prosecution of other terrorism cases as a term of his release. The (1) expiration of Babar's cooperation requirement and term of supervised release on December 10, 2020, and (2) Babar's stated intent to leave the United States immediately thereafter create a substantial risk that he will become unavailable before the instant mandamus petition is resolved.

1

Modifying the stay to permit the deposition will serve the public interest and will avoid potentially irreparable injury to the government. The Department of Defense expects Babar to provide critically important testimony, including that Babar personally observed petitioner acting as a senior al Qaeda commander during the period in which petitioner allegedly committed the offenses. The principal injury petitioner alleged in his motion requesting a stay—that he would be forced to litigate before the same military judge whose qualifications petitioner challenges in the mandamus petition—is moot now that the challenged military judge is no longer presiding over petitioner's military commission case. The requested modification would permit only those proceedings necessary to depose Babar to preserve his testimony if he is ultimately unavailable to testify at trial. All other proceedings would remain stayed under this Court's stay order. If this Court modifies the stay, the government will seek expedited military commission proceedings to ensure that the deposition occurs before December 10, 2020.

Petitioner opposes the government's motion to modify the stay and asks this Court for an opportunity to present its arguments in writing.

<u>STATEMENT</u>

In June 2014, a military commission was convened to try petitioner for noncapital charges, including denying quarter, attacking protected property, using and attempting treachery or perfidy, and conspiring with Usama bin Laden and other al Qaeda leaders to commit terrorism. <u>See</u> Referred Charges, <u>United States v. Abd al Hadi al-Iraqi</u> (June 2, 2014).[1] The charges arise from petitioner's alleged leadership role in conducting unlawful attacks in Afghanistan, Pakistan, and elsewhere from 2001 to 2006. <u>Id.</u> Those attacks resulted in death and injury to U.S. and coalition servicemembers and civilians. <u>Id.</u> The military commission set a trial date for September 16, 2020. 5th Amended Litigation Schedule, AE 110V (Oct. 23, 2019).

On October 15, 2019, petitioner filed the instant petition for a writ of mandamus and prohibition in this Court. The petition alleges that all three judges who have presided over petitioner's case should have been disqualified based on applications for post-retirement employment by the first judge and by a law clerk who worked for the second and third judges. Petitioner principally relies on a

---

[1] Petitioner is charged under the name "Abd al Hadi al-Iraqi." Unclassified filings in the military commission case can be accessed by visiting the Office of Military Commissions website, https://www.mc.mil/CASES/ MilitaryCommissions.aspx, and clicking on the link for "Abd al Hadi al-Iraqi." Unless indicated otherwise, references to appellate exhibits ("AE") refer to the military commission case in <u>United States v. Abd al Hadi al-Iraqi</u>.

decision by this Court in a separate case holding that a military commission judge's application for employment as an immigration judge created a disqualifying conflict requiring vacatur of his orders from the date of his initial application.  See In re Al-Nashiri, 921 F.3d 224, 235-37 (D.C. Cir. 2019).

Petitioner also sought a stay of further proceedings in the military commission pending this Court's resolution of his mandamus petition.  On November 6, 2019, this Court granted petitioner's request for a stay, concluding that petitioner "satisfied the stringent requirements for a stay."  Order, No. 19-1212 (D.C. Cir. Nov. 6, 2019) (per curiam) (citing Nken v. Holder, 556 U.S. 418, 434 (2009), and D.C. Circuit Handbook of Practice and Internal Procedures 33 (2018)).

On January 15, 2020, the third military judge to preside over petitioner's case announced his recusal from the case.  Recusal Mem., AE 1C (Jan. 15, 2020). The Chief Judge of the Military Commission Trial Judiciary has not assigned a new judge to the case.

On May 15, 2020, this Court referred the petition to a merits panel, set a briefing schedule, and directed the clerk to schedule oral argument.  According to that schedule, briefing will be complete by October 14, 2020.  See Order, No. 19-1212 (D.C. Cir. May 15, 2020) (per curiam).  Oral argument has not yet been scheduled.

<u>ARGUMENT</u>

I.      <u>Legal Standards</u>

This Court may grant a stay pending appeal if the petitioner shows (1) a substantial likelihood of success on the merits of the appeal; (2) that the moving party will suffer irreparable injury if the stay is denied; (3) that issuance of the stay will not cause substantial harm to other parties; and (4) that the public interest will be served by issuance of the stay. <u>United States v. Philip Morris, Inc.</u>, 314 F.3d 612, 617 (D.C. Cir. 2003). As an equitable remedy, this Court may modify the stay, in the interest of justice, if the government shows that the modification is in the public interest and that the stay "threaten[s] to foster rather than forestall irreparable harm." <u>See</u> <u>Consol. Edison Co. v. Fed. Power Comm'n</u>, 511 F.2d 372, 378 (D.C. Cir. 1974); <u>see also</u> <u>id.</u> (explaining that this Court is concerned with "principally the protection of the public interest" and "must determine . . . how the court's action serves the public best") (internal quotation marks and citation omitted). A stay "is subject always to adaptation as events may shape the need." <u>United States v. Swift & Co.</u>, 286 U.S. 106, 114 (1932).

Depositions in military commissions are governed by Rule for Military Commissions (RMC) 702. RMC 702 authorizes the military commission to grant a party's request to conduct a deposition "whenever, after swearing of charges, due to exceptional circumstances of the case it is in the interest of justice that the

5

testimony of a prospective witness be taken and preserved for use at a military commission."  RMC 702(a).[2]  To establish "exceptional circumstances," the movant must show (1) that the witness is unlikely to be available to testify at trial; (2) the witness's testimony is material; and (3) it is in the interests of justice to preserve the testimony.  See United States v. Kelley, 36 F.3d 1118, 1125 (D.C. Cir. 1994) (construing the analogous Federal Rule of Criminal Procedure 15).  To show unavailability, the government must show that a "substantial likelihood exists" that the witness will be unavailable to testify at trial.  United States v. Cooper, 947 F. Supp. 2d 108 (D.D.C. 2013) (citing United States v. Drogoul, 1 F.3d 1546, 1553 (11th Cir. 1993)).[3]

Like its federal-court analog, RMC 702 accommodates the special circumstances of terrorism cases, where the parties' cases may depend on

_____

[2] The rules for authorizing military commission depositions are consistent with, and similar to, rules governing depositions in federal criminal cases and courts-martial, both of which permit a party to preserve testimony for trial, through a deposition, because of exceptional circumstances and in the interest of justice. See Rule for Courts-Martial 702(a) (providing that the military judge may order a deposition "at the request of any party if the requesting party demonstrates that, due to exceptional circumstances, it is in the interest of justice that the testimony of a prospective witness be taken and preserved for use at trial"); FED. R. CRIM. P. 15 ("A party may move that a prospective witness be deposed in order to preserve testimony for trial.  The court may grant the motion because of exceptional circumstances and in the interest of justice.").

[3] A "more concrete showing of unavailability, of course, may be required at the time of trial before a deposition will be admitted in evidence."  Drogoul, 1 F.3d at 1553.

witnesses who are foreign-based enemy combatants or who will not travel to the United States to testify, either because they fear they will be prosecuted here or because they are in custody in other countries. See, e.g., Ruling, AE 70I (Feb. 21, 2017) (granting government motion to depose a witness who was convicted by military commission after pleading guilty to various terrorism offenses and who was repatriated abroad before petitioner's trial was scheduled to begin); see also United States v. Moussaoui, 382 F.3d 453, 456 (4th Cir. 2004) (observing that the defendant sought to preserve testimony, by deposition, of witnesses who were enemy combatants); United States v. Mostafa, 14 F. Supp. 3d 515, 522 (S.D.N.Y. 2014) (granting government's motion to depose a witness in the defendant's terrorism case, where the witness refused to travel to the United States because he feared arrest here). RMC 702 acknowledges the significant risk that such witnesses may be unavailable or unwilling to testify in military commission cases, and authorizes the parties to protect against that risk, while also providing the opposing party an opportunity for cross-examination, by preserving testimony through depositions. See RMC 702(g)(1)(A) ("At an oral deposition, the accused shall have the right to be represented by counsel who will examine, cross-examine and make objections on behalf of the accused.").

II.  Modifying the Stay To Permit the Requested Deposition Is in the Public
Interest and Will Avoid Potentially Irreparable Injury to the Government

A.  The Government Seeks To Preserve Testimony of a Crucial Witness
Who Will Provide Evidence Unavailable from Other Sources

The government seeks to preserve, through deposition, the testimony of

Mohammed Junaid Babar.  Babar, a Pakistani-born U.S. citizen, was an al Qaeda

operative who pleaded guilty to several terrorism offenses in the Southern District

of New York (SDNY) in 2011 for his role in supporting a plot to bomb pubs, train

stations, and restaurants in the United Kingdom.  See Judgment, United States v.

Babar, No. 04-cr-528 (S.D.N.Y. Jan. 4, 2011) (Attach. A).  Babar "is considered

one of the most valuable sources of intelligence on al Qaeda."  David Kris, Nat'l

Security Investigations and Prosecutions § 24:24 (Sept. 2019).  In the course of his

cooperation, "Babar testified as a government witness in four terrorism trials

overseas; was prepared to testify in a fifth terrorism trial" in the SDNY in 2010;

and "met with authorities from the U.S. government and foreign governments on

nearly 100 occasions in total during which he provided information about

organizations and individuals engaged in terrorist activities in various parts of the

world."  Letter from U.S. Att'y Preet Bharara to Judge Victor Marrero 7, United

States v. Babar, No. 04-cr-528 (S.D.N.Y. Nov. 23, 2010) ("USAO Letter")

(Attach. B).  Those individuals include petitioner, who is referred to in the letter as

"Abd al Hadi al Iraqi."  See id. at 3-8, 10.

Based on information Babar has previously provided to the government, the Department of Defense Office of the Chief Prosecutor (OCP) expects that Babar will testify that he personally met with petitioner in Afghanistan on four occasions from 2003 to 2004; that he provided petitioner with supplies and money intended to be used in jihad against U.S. and coalition forces; and that he personally observed petitioner acting as a senior al Qaeda commander in 2003 and 2004, the period in which petitioner allegedly committed the offenses in this case. See id. That evidence is critical to OCP's case because the charges against petitioner rely on a command theory of principal liability. The MCA provides that a commander is criminally responsible for unlawful acts committed by his subordinates if he "knew, had reason to know, or should have known, that a subordinate was about to commit such acts or had done so" and he "failed to take the necessary and reasonable measures to prevent such acts or to punish the perpetrators thereof." 10 U.S.C. § 950q(3). A superior-subordinate relationship between the commander and the direct perpetrator is an essential element to prove liability. Id. According to OCP, Babar is the only witness accessible to and cooperating with the government who directly observed petitioner serving as an al Qaeda commander during the relevant time period.

OCP also anticipates that Babar will corroborate portions of petitioner's statements to law enforcement. Such corroboration would support both the

admissibility and the probative value of those statements. See 10 U.S.C. § 948r (permitting the military judge to admit a defendant's statement if it was voluntary and "the totality of the circumstances renders the statement reliable and possessing sufficient probative value"). OCP would seek to preserve testimony from Babar corroborating the accuracy of petitioner's own statements that petitioner was a senior al Qaeda commander (establishing his command responsibility for the alleged offenses) and that petitioner was present in the region when petitioner ordered the attacks for which he is charged. If petitioner's statements to law enforcement personnel are not admitted at trial, OCP expects Babar's testimony will become even more critical to establishing that petitioner commanded al Qaeda's war on U.S. and coalition forces in that region at that time, which is a fact of consequence to every charge and specification against petitioner. OCP also expects Babar to testify that he provided petitioner with military equipment and money intended to be used in carrying out jihad against U.S. and coalition forces in the area at that time. And OCP expects Babar to corroborate the accuracy of information OCP intends to present at trial through documents, including information about petitioner's high-ranking position on the al Qaeda organization chart (which petitioner hand-drew for law enforcement personnel), as well as correspondence between petitioner and other co-conspirators.

B.	There Is a Significant Risk that Babar Will Become Unavailable Before the Mandamus Petition Is Resolved

In his plea agreement, Babar agreed to cooperate with the government in the investigation of other terrorism cases. See USAO Letter 11. Under that agreement, Babar has testified previously in four terrorism prosecutions. Id. at 7. But Babar's agreement expires when his term of supervised release runs out on December 10, 2020. See Judgment, United States v. Babar, No. 04-cr-528 (S.D.N.Y. Jan. 4, 2011). Babar has repeatedly told the Federal Bureau of Investigation that, once his agreement expires, he will no longer be willing to testify. Corey Affidavit ¶ 5 (Attach. C) (stating that Babar has said "[o]n dozens of occasions," and as recently as May 13, 2020, that Babar does not want to cooperate with the government once his supervised-release term expires). Babar has also declared on several occasions that he intends to leave the United States as soon as possible after his supervised release term expires. Id. ¶¶ 6-7 (stating that Babar has repeatedly asked when his "U.S. passport would be returned" to him and has frequently noted his desire to leave the United States to relocate to another country with his family as soon as possible). OCP understands that once Babar's supervised release term expires, "his passport will be returned to him." Id. ¶ 6.

The expiration of Babar's obligation to cooperate with the government on December 10, 2020, and his oft-stated intent to leave the United States immediately thereafter, create a substantial risk that he will become unavailable

before the mandamus petition pending in this Court is resolved.  Although military commission judges have some authority to compel unwilling witnesses to testify, including witnesses located overseas,[4] that authority may be ineffective as a practical matter if Babar moves to a country without a cooperative government or if his location is unknown.  Babar may move to Pakistan, for example, where he was born and where he lived periodically in the early 2000s while he supported terrorist activities.  See USAO Letter 2-6.  Moreover, even if, by the time of petitioner's trial, the government can locate Babar in a jurisdiction subject to the military commission's writ, the military commission's practical ability to compel testimony from recalcitrant witnesses is limited.  Cf. Mem. Op., Baker v. Spath, No. 17-2311 (D.D.C. June 18, 2018) (vacating the military commission judge's contempt conviction of a witness who appeared at a military commission proceeding but refused to testify, on the ground that only a military commission acting through its members, and not the military judge alone, may convict a

---

[4] The MCA and its implementing rules provide the military commission with nationwide subpoena power over civilian witnesses, as well as U.S. citizens overseas.  See 10 U.S.C. § 949j(a)(2) (stating that the "[p]rocess issued in military commissions under this chapter to compel witnesses to appear and testify and to compel the production of other evidence (A) shall be similar to that which courts of the United States having criminal jurisdiction may lawfully issue; and (B) shall run to any place where the United States shall have jurisdiction thereof"); see also RMC 703(b), (e)(2) (stating that "the military judge" or "the Chief Prosecutor or his designee" may issue a subpoena to compel the testimony of "civilian witnesses" whose "testimony on a matter in issue on the merits or on an interlocutory question would be relevant and necessary").

witness for criminal contempt).  Thus, the likelihood that Babar will become unavailable as a witness in petitioner's military commission case shortly after December 10, 2020, is sufficiently compelling to warrant taking his deposition now to preserve his testimony for trial later.

III.     If This Court Modifies the Stay, the Government Will Seek Expedited Military Commission Proceedings To Ensure that the Requested Deposition Occurs Before December 10, 2020

If this Court grants the limited modification of the stay sought in this motion, OCP will immediately notify the Chief Judge of the Military Commission Trial Judiciary and request expedited detailing of a military judge to the case, pursuant to Regulation for Trial by Military Commission ¶ 6-2.  Then OCP will file a motion asking the military judge to order Babar's deposition and to have an experienced judge advocate detailed to serve as the deposition officer, under RMC 702.  OCP would not bring any other motions or business before the military commission.  OCP anticipates, based on an expedited briefing cycle, that if this Court can decide this motion by mid-September 2020, a military judge could be detailed, could consider OCP's motion requesting the deposition, and could order the deposition to be scheduled by the end of October 2020—providing nearly six weeks for the parties to prepare for and to conduct the deposition before Babar's cooperation agreement expires.  OCP expects its examination of Babar to last one day, allowing ample time on the calendar for petitioner's cross-examination (and

13

any re-direct examination).  OCP is prepared to conduct the deposition at the earliest possible date.

The Department of Defense is working to facilitate commission proceedings while safeguarding participants and adhering to COVID-19 policies.  According to current U.S. Southern Command orders, all parties traveling to Guantánamo Bay are subject to restrictions on movement (ROMs) and are required to spend 14 days in quarantine upon arrival, unless a waiver or alternative protective process is approved.  Regardless of whether the ROMs have been lifted by the time the deposition is ordered, the military judge can order a deposition to take place either in the courtroom at Guantánamo Bay, with Babar appearing and answering questions via videoteleconference (VTC)[5] from the Mark Center,[6] or at a state-side

---

[5] Regardless whether travel restrictions exist at the time the military judge issues a deposition order, Babar must testify remotely because Babar cannot be compelled to appear at Guantánamo Bay.  See Regulation for Trial by Military Commission ¶ 13-5b (2011) ("A civilian may not be compelled by subpoena to leave the United States and travel to a foreign country; therefore, a subpoena issued to a civilian to testify at Guantanamo Bay may not be enforced in the United States") (citing United States v. Bennett, 12 M.J. 463 (C.M.A. 1982)).  Babar can be compelled however to appear remotely from the Mark Center.  See 10 U.S.C. § 949j(a)(2); RMC 703(b), (e)(2).

[6] The Mark Center, a Department of Defense facility in Alexandria, Virginia, can support classified and unclassified VTCs with the courtroom in Guantánamo Bay.  The Mark Center has already supported remote testimony via secure VTC in several military commissions, including petitioner's military commission, and another location in the National Capital Region has supported a deposition via secure VTC in the military commission case of United States v. Mohammad.  Order, AE 616PP, United States v. Mohammad (Nov. 25, 2019) (Under Seal).

14

secure VTC installation (e.g., the Mark Center) with petitioner and his counsel present in the courtroom and able to communicate privately with co-counsel, in real-time, via a secure telephonic link during the deposition. This practice has been used successfully in past commissions to conduct pretrial depositions of witnesses,[7] where the deposition testimony was video-recorded and transcribed verbatim. OCP will request the same preservation of the deposition testimony under RMC 702.

Should the military judge require the presence of all parties at Guantánamo Bay for a commission session pursuant to RMC 803, for example to conduct oral argument[8] to resolve any deposition-related issues before the deposition, then all parties would comply with current ROMs and travel to Guantánamo Bay. Under RMC 804(a), petitioner has a right to be present at all pre-trial sessions of a

---

[7] Although the deponent was present in the courtroom in prior cases, a deposition can be conducted with either the defendant or the deponent participating remotely, in accordance with the rules and consistent with past military commission practice. See Military Commission Rule of Evidence 611(d)(3) (allowing a military judge to remotely take trial testimony from a witness, whose presence at trial cannot be obtained by legal process under circumstances applicable here); see also RMC 914A (allowing remote testimony from a witness after the military judge has determined that the requirements of MCRE 611(d) have been satisfied); RMC 703(c)(3) ("Upon request of either party the military judge may permit a witness to testify from a remote location by two-way video teleconference, or similar technology. [If opposed] the military judge shall resolve the matter by balancing all probative factors . . .").

[8] The decision whether to grant oral argument is solely within the military judge's discretion. RMC 905(h).

commission, even sessions regarding questions of law.  If the military judge

requires RMC 803 sessions, the government will seek to conduct the deposition in

the courtroom following the sessions, thus mitigating logistical difficulties

resulting from any ROMs still in effect at that time.  In that instance, Babar would

appear at the deposition via VTC at a secure state-side facility (e.g., the Mark

Center).  Petitioner has the opportunity to be present during the deposition, either

physically in or remotely from the courtroom.

IV.    Preserving Crucial Evidence in this War Crimes Prosecution Is in the
       Public Interest

This is an important war-crimes prosecution in which OCP alleges that

petitioner commanded al Qaeda's insurgency efforts in Afghanistan and Pakistan

from 2002 to 2005 and that, as a senior al Qaeda commander, he supported,

supplied, funded, and directed attacks against U.S. and coalition forces and

civilians.  See Referred Charges (June 2, 2014).  These attacks involved, for

example, detonating improvised explosive devices and suicide vests in civilian

areas.  Id.  According to the charges, petitioner's offenses resulted in death and

injury to U.S. and coalition servicemembers and civilians in Afghanistan, Pakistan,

and elsewhere.  Id.

"The principal consideration guiding whether the absence of a particular

witness's testimony would produce injustice is the materiality of that testimony to

the case."  Drogoul, 1 F.3d at 1552.  OCP alleges in the charges that petitioner

16

rewarded an intentional attack killing a United Nations aid worker; that, at petitioner's direction, petitioner's fighters fired upon a medical helicopter as it attempted to recover casualties; and that petitioner directed his fighters to kill all coalition soldiers they encountered during their attacks, directly or perfidiously, and to deny quarter to the same. <u>See</u> Referred Charges, (June 2, 2014). As explained above, Babar's testimony is crucial to the case because OCP anticipates that his testimony would establish petitioner's liability for the acts of his subordinates as their commander. According to OCP, such evidence is unavailable from other sources because Babar is the only available witness who directly observed petitioner serving as an al Qaeda commander during the relevant time period. Preserving this evidence, which would otherwise be lost to the finders of fact at trial, serves the public and the victims' interest in the search for truth and accountability for commanders who direct their subordinates to violate the law of war. <u>See</u> <u>United States v. Cokeley</u>, 22 M.J. 225, 227 (C.M.A. 1986) (observing that depositions can be "a useful tool in the search for truth in a criminal case by preserving evidence that would otherwise be lost to the finders of fact").

V.    <u>Petitioner Will Not Suffer Irreparable Injury</u>

"When a prospective witness is unlikely to appear at trial and his or her testimony is critical to the case, simple fairness requires permitting the moving party to preserve that testimony—by deposing the witness—absent significant

countervailing factors which would render the taking of the deposition unjust."

Drogoul, 1 F.3d at 1552. In his motion requesting a stay order, petitioner alleged

that he would suffer irreparable injury absent the stay order because he would be

forced to litigate before the same military judge whose qualifications petitioner

challenged in the mandamus petition. See Pet'r Stay Mot. 14-16, In re Al-Tamir,

No. 19-1212 (filed Oct. 15, 2019). That alleged injury is moot now that the

challenged military judge is no longer presiding over petitioner's military

commission case. See Recusal Mem., AE 1C (Jan. 15, 2020) (recusing himself to

pursue post-retirement employment). The deposition motion the government seeks

to file would be decided by a new military judge, and, if granted, a new military

judge could serve as the deposition officer. See RMC 702(f) (setting forth the

deposition officer's duties). Petitioner would have the opportunity through voir

dire, if the military judge determines it is appropriate, to verify and challenge the

military judge's qualifications, and those of the deposition officer. There is every

reason to expect that the Chief Judge of the Military Commission Trial Judiciary

would take great care in detailing to petitioner's case a new military judge without

any apparent conflicts or disqualification concerns. See generally Hawsawi v.

United States, 389 F. Supp. 3d 1001, 1007 (C.M.C.R. 2019) (citing United States

v. Quintanilla, 56 M.J. 37, 44 (C.A.A.F. 2001) ("There is a strong presumption that

a judge is impartial . . . .")). All of the allegedly disqualifying employment

18

applications by the first military judge and the law clerk in petitioner's case took place before this Court's decision in Nashiri. See In re Al-Nashiri, 921 F.3d at 235-37 (holding that the military commission judge's application for employment as an immigration judge created a disqualifying conflict requiring vacatur of his orders from the date of his initial application); see also al-Iraqi v. United States, No. 19-004, 2020 WL 2569846, at *32, 44 (C.M.C.R. Apr. 21, 2020) (holding that the first military judge in petitioner's case was disqualified and providing for reconsideration of that military judge's decisions by a subsequent military judge); Ruling 16, AE 158R (Oct. 4, 2019) (same).

If this Court grants the government's motion to modify the stay order, the government would seek from the military commission only an oral deposition of Babar for the sole purpose of preserving Babar's testimony in case he is ultimately unavailable to testify at trial. All proceedings unnecessary to conduct that deposition would remain stayed pursuant to this Court's stay order. Petitioner would have the right to preserve objections, to cross-examine Babar, and to challenge the admissibility of the deposition, should the government seek to admit it, both at trial and on appeal. See RMC 702(g) ("At an oral deposition, the accused shall have the right to be represented by counsel who will examine, cross-examine and make objections on behalf of the accused."); see also RMC 702(h) (requiring parties to make objections at the deposition).

## CONCLUSION

For the reasons set forth above, this Court should grant the government a limited, temporary modification of the stay order to permit military commission proceedings necessary to enable the government to preserve, through a deposition, the testimony of Mohammed Junaid Babar in case he is unavailable to testify at trial.

Respectfully submitted,

| | |
|---|---|
| MARK S. MARTINS<br>Brigadier General, U.S. Army<br>Chief Prosecutor of Military Commissions | JOHN C. DEMERS<br>Assistant Attorney General<br>for National Security |
| HARIDIMOS V. THRAVALOS<br>Appellate Counsel<br>Office of the Chief Prosecutor<br>of Military Commissions | JOSEPH F. PALMER<br>DANIELLE S. TARIN<br>Attorneys<br>National Security Division<br>U.S. Department of Justice<br>Washington, DC 20530 |

<u>CERTIFICATE OF COMPLIANCE WITH VOLUME LIMITATION,</u>
<u>TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

1. This motion complies with the volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because:

this motion contains 4,784 words.

2. This response complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

this motion has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14 point font size and Times New Roman type style.

DATED: July 22, 2020          <u>/s/ Danielle S. Tarin</u>
                                         Danielle S. Tarin
                                         Attorney for the United States

# CERTIFICATE OF SERVICE

U.S. Court of Appeals Docket Number 19-1212.

I hereby certify that I electronically filed the foregoing Motion To Modify Stay of Proceedings with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on July 22, 2020.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED:  July 22, 2020

/s/ Danielle Tarin
Danielle Tarin
Attorney for the United States

# ATTACHMENT A

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
        Sheet 1

# UNITED STATES DISTRICT COURT ORIGINAL

SOUTHERN _____ District of _____ NEW YORK

| UNITED STATES OF AMERICA | JUDGMENT IN A CRIMINAL CASE |
|---|---|

UNITED STATES OF AMERICA
**V.**
MOHAMMED JUNAID BABAR

## JUDGMENT IN A CRIMINAL CASE

Case Number:

04-CR-528 (VM)

USM Number:           52190-054

Daniel Ollen
_____
Defendant's Attorney

## THE DEFENDANT:

X pleaded guilty to count(s)    One through Five of Information Number    04 CR 528

☐ pleaded nolo contendere to count(s) _____
  which was accepted by the court.

☐ was found guilty on count(s) _____
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §§ 2339A, 2339B, 3238 | Conspiracy to Provide Material Support or Resources to a Foreign Terrorist Organization | March 2004 | One and Three |
| 18 U.S.C. §§ 2339B, 2, and 3238 | Providing and Attempting to Provide Material Support or Resources to a Foreign Terrorist Organization | March 2004 | Two and Four |
| 50 U.S.C. § 1705(b), 31 CFR 595.204 and 595.205 | Making or Receiving a Contribution of Funds, Goods, or Services to, and for the Benefit of, Al Qaeda | March 2004 | Five |

        The defendant is sentenced as provided in pages 2 through ___6___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are  dismissed on the motion of the United States

☐ Underlying Indictment(s) _____ ☐ is ☐ are  dismissed on the motion of the United States.

☐ Motion(s) _____ ☐ is ☐ are  denied as moot.

        It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

Date of Imposition of Judgment: 12-10-10

_____
Signature of Judge

Name and Title of Judge: Hon. Judge Victor Marrero, U.S.D.J.

Date: December 10, 2010

AO 245B     (Rev. 06/05) Judgment in Criminal Case
            Sheet 2 — Imprisonment

Judgment — Page __2__ of __6__

DEFENDANT:       MOHAMMED JUNAID BABAR
CASE NUMBER:     04 cr 528 (VM)

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

Time Served

☐   The court makes the following recommendations to the Bureau of Prisons:

☐   The defendant is remanded to the custody of the United States Marshal.

The defendant shall surrender to the United States Marshal for this district:

☐   at _____   ☐ a.m.   ☐ p.m.   on _____ .

☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

before 2 p.m. on   _____ .

☐   as notified by the United States Marshal.

☐   as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____   to _____

a_____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B      (Rev. 06/05) Judgment in a Criminal Case
             Sheet 3 — Supervised Release

DEFENDANT:       MOHAMMED JUNAID BABAR
CASE NUMBER:     04-CR-528 (VM)

Judgment—Page ___3___ of ___6___

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

Ten Years, with the option to apply for termination of supervision after five years.

    The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

X    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

X    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

X    The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

    If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

    The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)    the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)    the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)    the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)    the defendant shall support his or her dependents and meet other family responsibilities;

5)    the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)    the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)    the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)    the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)    the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)    the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)    the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)    the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)    as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
           Sheet 3A — Supervised Release

Judgment—Page ___4___ of ___6___

DEFENDANT:       MOHAMMED JUNAID BABAR
CASE NUMBER:     04-CR-528 (VM)

## ADDITIONAL SUPERVISED RELEASE TERMS

(1) MR. BABAR SHALL CONTINUE TO COOPERATE WITH THE GOVERNMENT AS HE HAS BEEN
THROUGHOUT THE PERIOD OF HIS SUPERVISED RELEASE.

| | Judgment — Page __5__ of __6__ |
|---|---|
| DEFENDANT: MOHAMMED JUNAID BABAR | |
| CASE NUMBER: 04-CR-528 (VM) | |

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 500.00 | $ 0 | $ 0 |

☐  The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $ _____ $0.00 | $ _____ $0.00 | |
|---|---|---|---|

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐  the interest requirement is waived for the    ☐  fine    ☐  restitution.

    ☐  the interest requirement for the    ☐  fine    ☐  restitution is modified as follows:

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
           Sheet 6 — Schedule of Payments

DEFENDANT:        MOHAMMED JUNAID BABAR          Judgment — Page  6  of  6
CASE NUMBER:      04-CR-528 (VM)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

**A**  X  Lump sum payment of $ ___100.00___ due immediately, balance due

     ☐ not later than _____ , or
     ☐ in accordance      ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

**B**  ☐  Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

     Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

# ATTACHMENT B

*United States Attorney*
*Southern District of New York*

_____

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York   10007*

November 23, 2010

**TO BE FILED UNDER SEAL**
**BY HAND DELIVERY**

Honorable Victor Marrero
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street, Room 660
New York, New York, 10007

> **Re:**   **United States v. Mohammed Junaid Babar**,
>              **04 Cr. 528 (VM)**

Dear Judge Marrero:

The Government respectfully submits this letter to advise the Court of the pertinent facts concerning the assistance that Mohammed Junaid Babar has rendered in the investigation and prosecution of other persons.   In light of these facts, and assuming that Babar continues to comply with the terms of his cooperation agreement and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the United States Sentencing Guidelines and Title 18, United States Code, Section 3553(e), that the Court sentence Babar in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Sentencing Guidelines. Babar is currently scheduled to be sentenced on December 10, 2010.

### Babar's Offense Conduct

As set forth in the Probation Office's Pre-sentence Report dated October 29, 2010, Babar first became known to law enforcement through his activities with the fundamentalist group al-Muhajiroun ("ALM") in New York.   ALM was founded in 1985 and supported the overthrow of Western governments and the institution of an Islamic state.   In the late 1990s and early 2000s, ALM maintained offices in New York, London and Pakistan, among other places.

Babar joined ALM while a student at SUNY-Stonybrook in 2000.   It was through his membership in ALM that Babar met and befriended Syed Hashmi.   Babar was active in ALM from January to September 2001, and held ALM meetings in the basement of his parents' house in Queens.   During this time period, Babar and Hashmi organized numerous ALM-sponsored events, including lectures and demonstrations, in and around New York City.

Honorable Victor Marrero
November 23, 2010

On September 20, 2001, following the attacks of September 11, 2001, Babar left the United States to move to Pakistan to provide support to the Afghan jihad. At the time, Babar intended to travel to the front lines in Afghanistan to fight for the establishment of an Islamic state in Afghanistan.

After Babar arrived in Pakistan in the fall of 2001, he immediately began working at the ALM office in Lahore. At the office, he participated in a video recorded television interview with a British news reporter. On November 4, 2001, the British 5 News in the United Kingdom broadcast a story describing Al-Muhajiroun as a facilitator of United Kingdom citizens' travel to Afghanistan through Pakistan to fight for the Taliban against Western forces. During this broadcast, under the caption, "Taliban New Yorker," Babar stated, "I did not feel any remorse for the Americans [who died]. . . . I am willing to kill the Americans. I will kill every American that I see in Afghanistan. And every American soldier I see in Pakistan." During initial proffers with the Government, Babar stated that he made these statements to the reporter because the reporter paid Babar $500 to do so. However, Babar later admitted that he was never paid any money by the reporter.

According to Babar, he still supports today the killing of American military service members on battlefields in Muslim countries. Babar has advised that he also supports the killing of Americans (both military and civilian) in Muslim countries "occupied" by the United States.

During his first year in Pakistan in 2001 and 2002, Babar worked at the Pakistani Software Export Board ("PSEB"), an agency within the Pakistan Government. Babar used his PSEB employment identification card to create approximately ten false identification cards for his friends and fellow jihad supporters. The false PSEB identification cards were valuable within Pakistan because they allowed the holder to claim an affiliation with the government and to travel more freely. In addition, after leaving the PSEB in early 2003, Babar stole five laptop computers from the agency, some of which he sold to friends.

Notwithstanding his jobs during his initial months in Pakistan, Babar spent the majority of his time working for ALM-Pakistan whose primary goal at the time was the overthrow of the Pakistan Government. Babar worked directly with Sajeel Shahid, the head of ALM-Pakistan, as he (Babar) continued to search for opportunities to support the Afghan jihad.

During this period, Babar participated in two different sets of discussions regarding plots to assassinate the President of Pakistan. During the first of these discussions, machine guns and grenades were obtained by others and Babar buried them for later use. Neither set of discussions advanced past the planning stage.

At this time, Babar also participated in discussions about bombing the French embassy in Pakistan, as well as an English library and cultural center in Pakistan; however, these discussions also did not advance beyond the planning stage.

−2−

As part of his efforts to raise money in support of jihadist activities in Pakistan, Babar traveled to London in December 2002.    During that trip, Babar met Omar Khyam, a known U.K.-based jihad supporter, at a lecture, and asked Khyam for money for jihad; however, Khyam refused to give Babar any money at that time.

After a one-month stay in London, Babar returned to Pakistan.   In early 2003, Babar attended a meeting of al Qaeda supporters in Islamabad and saw Khyam again.   During that meeting, another al Qaeda supporter, Salahuddin Amin, a/k/a "Khalid," discussed the different types of training he could arrange for members of the group.   Approximately one month later, Babar met with Khyam again in Pakistan, and Khyam discussed for the first time with Babar the fact that he worked for Abd al Hadi al Iraqi ("Hadi al Iraqi").   According to Babar, Khyam told him that Hadi al Iraqi was the third in command within al Qaeda behind Osama bin Laden and Ayman al Zawahri and the senior commander of al Qaeda's fighters in Afghanistan and Pakistan.

Shortly after this meeting with Khyam, Babar returned to London to meet with al Qaeda supporters based there.   During this visit, he met with Khyam again at a hotel outside the city. During this meeting, Khyam introduced Babar to his brother and told Babar that he was in England to buy equipment to send back to Pakistan for a training camp he was setting up.   After approximately one month in England, Babar returned to Pakistan.

In May 2003, Khyam contacted Babar in Pakistan, and asked Babar if he could live in the guest quarters of Babar's house in Lahore.   Babar agreed, and in June 2003, Khyam and a friend of his, Anthony Garcia, moved in with Babar.   At this time, Khyam asked Babar if he could arrange a training camp for him and his associates to conduct physical training and weapons training.

After Khyam moved into the guest quarters at Babar's residence in Pakistan, Khyam told Babar that he wanted to bomb soft targets, including trains and nightclubs, in England.   Khyam also spoke in positive terms about a recent suicide bombing at a restaurant in Israel.   In response, Babar said that more needed to be done.   This conversation was the first of several that Khyam and Babar had about potential targets for detonating a bomb, though Babar was never aware of any specific targets identified by Khyam and the other members of the plot.

As part of the conversations about the bomb plot in England, Khyam asked Babar to transport detonators in radios from Pakistan to Khyam in Belgium who would then transport them to England.   In furtherance of this plan, Khyam gave Babar several detonators.   Khyam also sent Babar approximately 230,000 Pakistani rupees (approximately $2700) via a wire transfer and told Babar that some of the money was for expenses related to Babar's transport of the detonators. Babar never bought any additional aluminum powder and never brought any detonators to England. Babar and Khyam also discussed possibly targeting the U.K., Spain and France; Babar suggested hitting multiple targets either simultaneously or seriatim.

Honorable Victor Marrero
November 23, 2010

When Khyam was staying in Babar's house in Lahore, Khyam had a black grocery bag filled with what Khyam said was ricin. Ricin is a severely toxic protein that has been used as an agent of chemical and biological warfare in the past. When Khyam left Pakistan in September 2003, he left the ricin in Babar's house; Babar stated that he later disposed of it.

In July 2003, Babar arranged a three-week training camp in a remote region of Pakistan where Khyam and about ten other young men received training on various types of weapons. Babar charged Khyam 4,000 British pounds for setting up the facility. Babar also coordinated the rental of a private bus to transport the individuals to and from the camp near Peshawar. The training lasted for the entire month. At the camp, the attendees received training in basic military skills, as well as the use of explosives and weapons. Babar only attended the last few days of the camp but during that time, he saw Khyam detonate a one pound ammonium nitrate bomb. In addition, according to Babar, during the stay at the camp, Khyam was "feeling people out" regarding their interest in martyrdom for the bomb operation in England.

During the training camp, Babar provided a video camera which was used to tape the participants, who wore scarves to cover their faces, as they shot at targets and chanted about jihad. According to Babar, Khyam wanted to make the videotape to distribute to associates in the U.K.

After returning from the camp, at Khyam's suggestion, Khyam and Babar together bought different types of substances for use in making bombs, including aluminum powder, ammonium nitrate and urea. They stored the substances in a closet in Babar's residence in Lahore. Around that time, Khyam and Babar constructed a bomb using a jar from Babar's kitchen and then detonated it in the backyard of Babar's residence.

Khyam returned to London in September 2003. He brought some of the aluminum powder he and Babar had bought with him. He also asked Babar to bring additional aluminum powder with him on his next trip to England, and later sent Babar several hundred British pounds to pay for Babar's airfare and for the additional aluminum powder. Babar never brought any aluminum powder to England.

In October 2003, Khyam and Amin, a known al Qaeda supporter, asked Babar to send gear to Hadi al Iraqi that Khyam had left behind in Pakistan with Amin. Babar met with Amin to receive the gear and Amin confirmed to Babar that he also worked for Hadi al Iraqi. After receiving the gear from Amin, Babar sent it to Hadi al Iraqi who was based in North Waziristan in the border region between Afghanistan and Pakistan.

Also in October 2003, Babar traveled to Islamabad to meet with Momin Khawaja. Khawaja, a Canadian resident, was part of the group led by Khyam plotting to bomb soft targets in England. During this trip, they met with Amin. Khawaja was a computer programmer in Canada and they discussed the possible use of remote devices, i.e., devices that could detonate explosives from a distance. Khawaja also told them that he was working on creating a model

airplane that could carry explosives and could be navigated by a GPS system.   During this meeting, Khawaja gave Amin 1,000 to 1,500 British pounds to give to Abu Munthir, a known al Qaeda leader.

In early January 2004, Babar arranged for another individual who knew Hadi al-Iraqi to introduce him (Babar) to the senior al Qaeda commander.   During the first meeting at a mosque in North Waziristan, Pakistan, Hadi confirmed that he had received the gear that Babar had sent him a few months earlier, specifically boots, sleeping bags, and clothing, which Babar had received from Amin.   In addition, Babar and another individual gave Hadi al Iraqi 10,000 Pakistani rupees to support jihad activities.

Approximately one week later, Babar traveled to meet with Hadi al Iraqi again.   During this meeting, Hadi al Iraqi asked Babar to provide him with materials in support of al Qaeda's jihad activities in Afghanistan.   Specifically, Hadi al Iraqi asked Babar to provide him with money and gear, namely, ponchos, shoes, socks, and sleeping bags.   Babar agreed to this request.

In January 2004, Babar traveled again to London in an effort to resolve a dispute among al Qaeda supporters about who was actually working for Hadi al Iraqi.   Shortly after Babar arrived in London, he and Khyam met in Khyam's car.   During this meeting, Khyam asked Babar, "Are you with us?"   Babar understood Khyam to be asking whether Babar planned to be part of the bomb plot.   In response, Babar indicated to Khyam that he planned to work on his own.

During the same visit, Babar stayed with Syed Hashmi, his friend whom he had met through ALM-New York in 2000, and used Hashmi's cellphone to contact Khyam and other al Qaeda supporters.   Babar also introduced Hashmi to Khyam and Khyam's brother.   Babar and Hashmi also attended several meetings with al Qaeda supporters about the need to support Hadi al Iraqi.

During his nearly two-week stay with Hashmi in London, Babar collected two to three garbage bags full of gear from other al Qaeda supporters in London, which he stored in Hashmi's bedroom with Hashmi's knowledge.   The gear included ponchos, waterproof socks and raincoats. Babar collected this gear in order to deliver it to Hadi al-Iraqi when he returned to Pakistan. When he left Hashmi's apartment in early February 2004, he took some of it, as well as additional gear he received from Tanveer Ali, another London-based al Qaeda supporter, with him on the plane back to Pakistan.   Babar left the remainder of the gear from Hashmi's apartment with Ali for Ali to bring to Pakistan the following week.

In February 2004, after he returned from the U.K., Babar again traveled to meet with Hadi al-Iraqi for the third time.   During this trip, Babar provided Hadi with the ponchos, waterproof socks, and raincoats that he had received from Tanveer Ali in the U.K.   One of the individuals who accompanied Babar on the trip, Ansar Butt, was one of the London-based al Qaeda supporters who had asked Babar for an introduction to Hadi al-Iraqi.   During the meeting, Butt gave Hadi

2,000 British pounds.   Babar met alone with Hadi for 15 minutes during this trip.   During this private meeting, he showed Hadi all of the gear that he had brought and also discussed activities in Afghanistan.

On or about February 21, 2004, Babar made his final trip to meet with Hadi.   Babar traveled with Tanveer Ali who had arrived from England.   Babar and Ali gave Hadi more ponchos, waterproof socks, sleeping bags, one set of night vision goggles and one set of binoculars with night vision capability.   Babar told Hadi that he was going to the U.K. for some period of time but that he would continue to raise money and bring similar items to Hadi in the future.   Ali did not return with Babar from South Waziristan; he told Babar that he intended to stay and fight jihad with Hadi for one year.

In early March 2004, Babar returned to New York to live with his parents in Queens.   Babar planned to save money working as a taxi cab driver and return to Pakistan to live with his wife and daughter.   There is no evidence that Babar returned to the United States in furtherance of any terrorist activity.

On March 30, 2004, as part of a English investigation known as Operation Crevice, Omar Khyam and others were arrested in England for their participation in a plot to detonate fertilizer bombs in various locations across England, including a shopping center and a nightclub.   The thirteen-month trial revealed that, over the course of at least five months, the group planned to make an improvised explosive device from ammonium nitrate fertilizer, which they intended to mix with aluminum powder, the necessary fuel for the detonation of the fertilizer.   They also discussed using a remotely operated detonation system to detonate the bomb.   In November 2003, in furtherance of the plot, the conspirators bought 600 kilograms (approximately 1,300 pounds) of fertilizer at a wholesale agricultural company in rural England, and rented a storage unit to secure the 600 kilogram bag of fertilizer.

On April 6, 2004, FBI agents approached Babar on the street after he walked out of his parents' house in Queens.   The FBI agents informed Babar that they wanted to speak to him and Babar voluntarily agreed to accompany them to a hotel room in Manhattan.   Once they arrived at the hotel, Babar was advised of his *Miranda* rights.   Babar waived his *Miranda* rights orally and in writing.   At the conclusion of the first interview by the FBI agents on April 6, 2004, the agents informed Babar that they wanted to continue to speak with him.   Babar voluntarily agreed to stay in the hotel room and continue the interview the next day.   The FBI agents continued to interview Babar from April 7, 2004, through April 10, 2004.

On April 10, 2004, at the conclusion of five days of voluntary interviews, Babar was arrested on a material witness warrant and taken into custody by the FBI.   On April 12, 2004, Babar was appointed counsel, presented before District Judge Leonard B. Sand, and ordered detained.

On June 3, 2004, after nearly two months of proffering, Babar pled guilty to a five-count Information before this Court, in which he was charged with four counts of providing and conspiring to provide material support to a foreign terrorist organization, namely al Qaeda, and to terrorist activity, in violation of 18 U.S.C. §§ 2339B and 2339A, and one count of making a contribution of funds, goods and services to, and for the benefit of, al Qaeda, in violation of 50 U.S.C. § 1705(b). Following his plea, Babar remained detained until December 18, 2008, when he was released on bail. Accordingly, to date, Babar has served approximately four years and eights months in prison in connection with the offenses to which he pled guilty.

### Babar's Other Criminal Conduct

Aside from the terrorism-related offenses to which Babar pled guilty in this case, Babar's other documented criminal conduct is limited to a New York State conviction for driving without proof of insurance for which he was fined $75. (See PSR §§ 64-65.) Babar has also admitted that he knowingly overcharged customers while working as a parking valet in New York in the late 1990s.

### Babar's Guidelines Range

The Government agrees with the Probation Office's calculation of Babar's sentencing range under the United States Sentencing Guidelines. Based on his plea to the five terrorism charges in Information 04 Cr. 528 (VM), Babar's base offense level is 26. Because the offenses involved the provision of funds and other material support or resources with the intent, knowledge or reason to believe they would be used to commit or assist in the commission of a violent act, a two-level increase is warranted. In addition, because the offenses are felonies that involved or were intended to promote a federal crime of terrorism, a twelve-level increase is warranted. After reducing the offense level three levels for acceptance of responsibility, Babar's total offense level is 37. Accordingly, given that he falls within Criminal History Category I, Babar's applicable Guidelines range is 30 years to life imprisonment. The statutory maximum sentence for Counts 1 through 5, however, is 70 years' imprisonment. Accordingly, absent cooperation, Babar would be facing a Guidelines range of 30 to 70 years' imprisonment.

### Babar's Cooperation and Assistance

Over the last six and a half years, the level of assistance provided by Babar to both the U.S. Government and foreign governments has been more than substantial; it has been extraordinary. As described in more detail below, Babar testified as a government witness in four terrorism trials overseas; was prepared to testify in a fifth terrorism trial in this District earlier this year; and met with authorities from the U.S. government and foreign governments on nearly 100 occasions in total during which he provided information about organizations and individuals engaged in terrorist activities in various parts of the world.

Babar attended his first proffer session with the Government on April 6, 2004, after he was approached on the street by representatives of the Joint Terrorism Task Force ("JTTF"). Babar agreed to go with the JTTF agents to a local hotel. Over the course of the following five days, Babar agreed to waive his *Miranda* rights and his right to speedy presentment as he answered the agents' questions about his prior conduct and the conduct of others. During these initial proffers, while generally forthright and credible, Babar was not entirely forthcoming regarding his knowledge of senior al Qaeda commander Hadi al Iraqi due to his concern that his contacts with Hadi al Iraqi would increase his criminal exposure. However, within a matter of days and before he was placed under arrest on April 10, 2004, Babar admitted that he had been withholding information on Hadi al Iraqi and provided the agents with a full accounting of his visits with Hadi al Iraqi. Other than that single instance, over the last six and a half years, the Government has found that Babar was always completely truthful about his criminal conduct and the criminal activities of others. Babar's memory has always been precise and detail-oriented, and the information he provided was regularly consistent with and corroborated by other evidence gathered by the U.S. and foreign governments.

During Babar's initial proffers, it quickly became apparent that his information was of significant value for not only U.S. law enforcement and intelligence agencies but also foreign authorities, including England and Canada. As a result, Babar's information was regularly disseminated by the FBI through standard law enforcement and intelligence channels. In fact, Babar's information was so credited and valued by authorities in England and Canada that he ultimately entered into the equivalent of cooperation agreements with each of those two countries. And it was pursuant to these agreements that Babar testified as a critical prosecution witness in three terrorism trials in England and one terrorism trial in Canada.

Babar's assistance was extremely useful to the Government in a number of ways. Preliminarily, Babar truthfully revealed his own criminal activities, including his organization of a month-long terrorist training camp in rural Pakistan in the summer of 2003, his efforts to assist several extremist groups in England with ties to al Qaeda, and his direct financial and material support of al Qaeda's military commander for Afghanistan and Pakistan at the time. Some of this information was not previously known to the Government and was not available through other sources.

More importantly, however, Babar provided valuable assistance in the successful prosecution and conviction of many others who engaged in serious terrorism activity, including Omar Khyam and his group in England, Momin Khawaja in Canada, and Syed Hashmi here in New York.

First, in the spring of 2006, Babar was flown to England to testify at the trial of Omar Khyam and others pursuant to his cooperation agreement with the English government. As referenced above, in March 2004, Omar Khyam and seventeen others, including Khyam's brother,

were arrested for their role in a plot to detonate fertilizer bombs in various locations across England, including a shopping center and a nightclub. Over the course of at least five months, the group planned to make an improvised explosive device from ammonium nitrate fertilizer and aluminum powder. They also discussed using a remotely operated detonation system to detonate the bomb. In furtherance of the plot, the conspirators bought 600 kilograms (approximately 1,300 pounds) of fertilizer, and were recorded discussing the distance needed for the remote detonation system and the use of a cellphone as a transmitter for the detonator.

Prior to trial, Babar met with English authorities on numerous occasions in order to draft his written statement, which was filed with the court in England in advance of trial and formed the basis of his trial testimony. The final version of Babar's witness statement for this trial numbered 47 pages. During the trial, Babar testified as the prosecution's lead witness and was on the stand for 15 days. In April 2007, after a trial and jury deliberations that spanned 13 months, Khyam and four other members of the plot were convicted of various terrorism offenses and all were sentenced to life imprisonment. At the time, this case was considered by many in England to be the most significant terrorism prosecution in the country's history.

According to English authorities, Babar was not only a credible witness at this trial but information provided by Babar led to the investigation of a number of individuals engaged in extremist activity not previously known to them. As a result, the English government has employed and continues to employ a variety of disruptive measures against these individuals, including imprisonment, to frustrate their activities.

Second, in the summer of 2008, Babar was flown to Canada to testify at the trial of Mohammad Momin Khawaja. As described above, Khawaja is a Canadian citizen who was charged for his role in the bomb plot in England led by Khyam. As with the English prosecution, Babar met with representatives of the Canadian government prior to this trial to prepare his testimony and he was again a critical witness for the prosecution. According to the Canadian government, Babar was "cooperative" and the information he provided "greatly assisted" them in their investigation. Babar was on the stand for four days. Khawaja was later convicted of various terrorism offenses, and in March 2009, he was sentenced to 10 and a half years' imprisonment.

Third, in April 2008, Babar testified via video-link in the English prosecution of Mohammed Shakil, Waheed Ali and Sadeer Saleem, three individuals charged with participating in the July 2005 London bus and train bombings that killed 52 people. In preparation for his testimony, Babar again met with English authorities on multiple occasions and assisted in the drafting of multiple witness statements that were filed with the court. While Babar did not provide testimony about the bomb plot itself, he offered important background information about certain of the defendants and their links to terrorist training camps and to terrorist activities. Babar was on the stand for two days. The trial ended in a hung jury, and a retrial was conducted in January 2009.

Honorable Victor Marrero
November 23, 2010

At the retrial, Babar once again testified via video-link for two days. After three months, the jury acquitted the three defendants of all charges relating to the July 7, 2005, bombings but convicted two of the defendants – Shakil and Ali – on charges relating to their plans to attend a terrorist training camp. Both Shakil and Ali were sentenced to 7 years' imprisonment.

Fourth, Babar was instrumental in securing the guilty plea of Syed Hashmi in this District to one count of conspiracy to provide material support to al Qaeda. As described above, Babar met Hashmi in 2000 through their mutual membership in ALM's New York chapter. They quickly became close friends as they shared similar views on jihad, al Qaeda and U.S. foreign policy. Four years later, after Babar had moved to Pakistan and Hashmi had moved to London, Babar stayed with Hashmi for approximately two weeks while he met with al Qaeda supporters there to discuss how they could support Hadi al Iraqi and his troops who were fighting Coalition forces in Afghanistan. During Babar's stay, Hashmi accompanied Babar to meetings with fellow al Qaeda supporters, allowed Babar to store gear at his apartment with the knowledge that it was destined for Hadi al Iraqi and his troops, and gave Babar several hundred dollars in cash for an airline ticket back to Pakistan so that Babar could provide the gear to Hadi al Iraqi.

Babar was the central witness (and only cooperating witness) in the Government's case against Hashmi, and thus it is clear that Hashmi pled guilty prior to trial with the knowledge that Babar would testify against him if he did not plead. The Government would have relied on Babar's testimony to explain his friendship with Hashmi, his private conversations with Hashmi about their mutual support of jihad and al Qaeda, and the details of Hashmi's involvement with other al Qaeda supporters in London and his participation in the provision of material support to Hadi al Iraqi, al Qaeda's military commander in Afghanistan and Pakistan.

Hashmi pled guilty before the Honorable Loretta A. Preska on April 27, 2010, and on June 10, 2010, he was sentenced to 180 months' imprisonment. Because Hashmi did not plead guilty until literally the eve of trial, the Government — and hence Babar — went through full pretrial preparations. Babar met with the Government numerous times, often for hours, to prepare for his trial testimony. He reviewed relevant emails and photographs, described in detail the interactions and conversations he had with Hashmi, Hadi al Iraqi and other relevant co-conspirators, and reviewed the extensive quantity of 3500 material that had been generated as a result of his prior testimony and interviews. Throughout the extended pre-trial period (the trial date was adjourned four times), Babar was cooperative and always did what was asked of him. At no point did any Government attorney or agent believe that Babar was not being truthful in the information he provided.

Finally, in addition to the trial testimony he provided in England and Canada and the testimony he was prepared to provide in this District, Babar supplied the Government and foreign governments with a wealth of credible information about terrorist organizations, including al Qaeda, and terrorist activity, including the London bomb plot. Some of this information was relevant to ongoing terrorism investigations both in the United States and abroad and some of it led

–10–

Honorable Victor Marrero
November 23, 2010

to the initiation of new investigations.   Because Babar agreed to cooperate on the day he was first approached and because he was honest, detailed and consistent about his own conduct from virtually the beginning of his proffers, the Government felt comfortable trusting Babar's information at a very early stage.   Foreign governments, in turn, came to rely on his insider's perspective as well, and Babar became a valued government resource for certain terrorism-related matters.[1]

## **Conclusion**

In sum, it is the Government's view that Mohammed Junaid Babar has contributed substantially and materially to the successful prosecution of the individuals named above.   Accordingly, assuming that Babar continues to comply with the terms of his cooperation agreement and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines and Title 18, United States Code, Section 3553(e), that the Court sentence Babar in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.   Because of the sensitive nature of this application, the Government further respectfully requests that this letter be filed **under seal**.

Respectfully submitted,

PREET BHARARA
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF NEW YORK


By:   /s/ Brendan R. McGuire
BRENDAN R. MCGUIRE

---

[1]     Although the majority of the individuals against whom Babar could reasonably be expected to testify have been convicted and sentenced or are beyond the Government's jurisdictional reach, some individuals remain unapprehended or are not presently in a position to be criminally prosecuted.   Should certain of those individuals be arrested or become available for prosecution, the Government may need to call Babar as a witness.   For this reason, the Government respectfully requests that the Court make it a specific condition of any term of supervised release that may be imposed on Babar that he continue to cooperate with the Government, pursuant to the terms of his cooperation agreement, for the duration of any such period of supervision.

Honorable Victor Marrero
November 23, 2010

Assistant United States Attorney
Telephone: (212) 637-2220

cc:  Daniel Ollen, Esq.
     U.S. Probation Officer Ross Kapitansky

# ATTACHMENT C

Affidavit of George F. Corey Jr.

I, George Corey, provide the information below personally known to me or provided to me and declare under penalty of law that the following is true and correct.

1. I am a Special Agent with the United States Attorney's Office for the Southern District of New York. I am assigned to the New York Joint Terrorism Task Force (NY-JTTF). I am a retired Police Detective from the New York City Police Department. I have continuously served on the NY-JTTF, first as an NYPD Detective and then as a Special Agent with the USAO-SDNY, since September 2001.

2. I became involved in the case of Mohammed Junaid Babar ("Mr. Babar") in 2003 when I was one of the investigators on his case. In 2004, Mr. Babar became a cooperating witness with the U.S. government. In 2006, I was assigned to be his handler and have been his handler since that time. In that capacity, I have interacted with him frequently and observed him closely over the last 14 years.

3. Mr. Babar is a naturalized U.S. citizen currently living under a protected identity, provided to him and his family as part of their participation in the U.S. Federal Witness Security Program ("WITSEC"). Although he is no longer in the WITSEC program, due to the sensitivities of his continued cooperation and other factors, the U.S. Government permitted him to retain and use the protected identities for him and his family. His current address and cover identity remains classified at the SECRET // WSP level.

4. Mr. Babar has testified against accused terrorists multiple times in multiple jurisdictions since 2004. When he testifies, he testifies in his true name. As a result of his significant cooperation in the prosecution of accused terrorists worldwide, he received a significant reduction in his possible sentence. On 10 December 2010, a judge sentenced him to time served and to be under supervised release for a period of 10 years from the date of the adjudged sentence with an option to apply for termination of supervision after 5 years. Mr. Babar did not apply for termination of supervision. Additionally, the judge ordered that Mr. Babar continue to cooperate as he had previously until the expiration of his supervised release. Mr. Babar's supervised release and cooperation requirement expire on 10 December 2020.

5. On dozens of occasions over the last 10 years, Mr. Babar has told me that when his cooperation requirement expires, he no longer wishes to cooperation with the U.S. government. As recently, as 13 May 2020, Mr. Babar indicated to me in a phone conversation that he no longer wants to cooperate once he is not required to do so as part of his sentence.

6. Mr. Babar has repeatedly inquired of me when his U.S. passport would be returned to him. As recently as 13 May 2020, he again asked when he would be getting his passport back. His passport is currently in possession of the Department of Justice. It is my understanding that once his period of supervised release is complete, his passport will be returned to him. As he has never violated the terms of his supervised release, I am unaware of any mechanism to deny him his U.S. passport once he has served his sentence.

7. Mr. Babar has frequently indicated to me his desire to depart the United States with his family as soon as he is able to do so. As recently as 13 May 2020, he referenced his desire to depart the United States, although he acknowledged the difficulty of achieving that so long as the COVID-19 pandemic continues to affect countries to which he might relocate. Mr. Babar is a highly intelligent individual. It is clear to me, based on my many conversations with him, that he has conducted significant research on departing U.S. jurisdiction with his family when doing so would no longer have negative legal ramifications for him.

I swear under penalty of law that the foregoing is true.


Date _MAY 13, 2020_

George F. Corey Jr
Special Agent
Department of Justice
United States Attorney's Office